**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ADVANTAGE HEALTHCARE, LTD., | |
| Plaintiff, | Case No. 17-cv-09001 |
| v. | Hon. Judge Sharon Coleman |
| | Hon Magistrate Judge Sheila Finnegan |
| DNA DIAGNOSTICS CENTER, INC., | |
| Defendants. | |

**DEFENDANT DNA DIAGNOSTICS CENTER, INC.'S LOCAL RULE 56.1(a)(3)**
**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT ON PLAINTIFF'S INDIVIDUAL CLAIMS**

**NOW COMES** Defendant, DNA DIAGNOSTICS CENTER, INC., by and through its

attorneys, and pursuant to Local Rule 56.1(a)(3), respectfully submits the following Statement of

Undisputed Material Facts in support of its Motion for Summary Judgment Pursuant to Federal

Rule of Civil Procedure 56.

**The Parties**

1.      Plaintiff, Advantage Healthcare, Ltd. ("Plaintiff" or "Advantage Healthcare"), is

an Illinois corporation with its principal place of business in Cook County, Illinois. (Dkt. # 1, ¶

5.)

2.      Defendant DNA Diagnostics Center, Inc. ("Defendant" or "DDC") is an Ohio

Corporation with its principal place of business in Fairfield, Butler County, Ohio. (Dkt. # 1, ¶ 6.)

**Venue and Jurisdiction**

3.      Plaintiff alleges this Court has subject matter jurisdiction under 28 U.S.C. § 1331

and 47 U.S.C. § 227. (Dkt. # 1, ¶ 7.) DDC admits that Plaintiff asserts a federal cause of action

under 47 U.S.C. § 227, but denies that Plaintiff has Article III standing to proceed in federal

court. (Dkt. # 33, ¶ 7.)

4.      Venue is proper in the Northern District of Illinois because the events alleged in the Complaint occurred in Cook County, Illinois. (Dkt. # 1, ¶ 5.)

### DDC's Medical Marketing Team

5.      One part of DDC's marketing department was the medical marketing team, which existed from before 1998 until 2013. (Declaration of James Hanigan, attached hereto as **Exhibit 1**, ¶ 3; *see also* Transcript of James Hanigan Deposition, attached hereto as **Exhibit 2**, pp. 7, 13, 16.) One of the services DDC provides is paternity testing. (*Id.*)

6.      James Hanigan, DDC's current digital marketing director, managed DDC's medical marketing team from 1998 until 2011. (Exh. 1, ¶¶ 1, 3.)

7.      Molly Mellott, currently an account manager at DDC, supervised DDC's medical marketing team from 2006 until 2010. (Transcript of Molly Mellott Deposition, attached hereto as **Exhibit 3**, p. 6.) Mellott was a member of the medical marketing team from 2006 until 2013. (*Id.*)

8.      The purpose of the medical marketing team was to establish and maintain a business referral relationship between DDC and a medical entity, such that medical entities would refer patients or other individuals inquiring about paternity testing to DDC. (Exh. 1, ¶ 3; Declaration of Molly Mellott, attached hereto as **Exhibit 4**, ¶ 2.)

9.      The medical marketing team established its business referral relationships with medical entities by making outbound telephone calls to them and offering them information about DDC's services so that medical entities could be educated about DDC's services and refer DDC as a source of paternity testing to others. Hanigan testified:

> It starts with a phone call to that medical entity. We first inquire as to whether the medical entity is getting questions about paternity testing, and if the answer is yes,

then we continue on the call in an attempt to educate the entity about DDC and ask them to refer DDC any time they get paternity inquiries.

(Exh. 2, pp. 31-32.)

10.     DDC has used a contact relationship management system called FileMaker Pro ("FileMaker") since before 1998. (Exh. 1, ¶¶ 2, 6.)

11.     Hanigan was Mellott's boss from 2006 until 2011, during which time Hanigan managed DDC's medical marketing team. (Exh. 2, p. 26.) Hanigan trained Mellott in the practices and policies of the medical marketing team, including the general protocol and verbal script that the medical marketing team followed to establish and maintain a business referral relationship with medical entities. (Exh. 4 ¶ 2; Exh. 3, pp. 12-13.)

12.     The medical marketing team followed the same general protocol, practices and procedures for establishing and maintaining a business referral relationship with a medical entity since 1998, when Hanigan instituted the practices and policies that DDC's medical marketing representatives would follow. (Exh. 4, ¶ 5.) Hanigan testified:

> Q:     Did that set protocol after that – after that six-month window for you to get it where you wanted it [after you first started at DDC in 1998], did it remain uniform through to the time the outbound calls stopped [in 2013]?
>
> A:     Again, I would say that the answer is yes. Each marketing supervisor may have put some of their changes to the nuances, but the bones were as mentioned.

(Exh. 2, p. 47.)

Mellott testified:

> Q:     Those practices, policies, general protocols that Mr. Hanigan trained you on, as a supervisor thereafter, through at the very least the end of 2010, did you follow those protocols, practices, policies that he trained you on?
>
> A:     Yes, sir.
>
> Q:     And then I understand towards the end of 2010, continuing up for about

> three more years to the end of 2013, when you were operating as a marketing team representative, even though you may not have been supervising the representatives, you're now doing the representative work, did you follow those same policies, protocols, etc., that Mr. Hanigan had trained you on to be a supervisor about?
>
> A:    Generally, yes.
>
> …
>
> Q:    And all of these things that you supervised and trained your marketing representatives on set forth here in paragraph no. 4 [of your declaration], are those the same things that Mr. Hanigan trained you on?
>
> A:    Yes.

(Exh. 3, pp. 12-14.)

13.    Hanigan trained Mellott in this general protocol when she first started working on DDC's medical marketing team in 2006, and Mellott trained medical marketing representatives to follow this protocol in her capacity as the medical marketing team supervisor from 2006 until 2010. (Exh. 4, ¶¶ 4-5; Exh. 3, pp. 12-15.)

14.    The general protocol DDC medical marketing representatives followed to establish a business referral relationship with a medical entity was to first make outbound telephone calls to medical entities such as hospitals, ob/gyns, women's healthcare facilities, genetic counselors, and Planned Parenthood centers. (Exh. 1, ¶ 4, Exh. 4, ¶ 6; *see also* Exh. 2, pp. 31-32.)

15.    During these initial phone calls to medical entities, the DDC medical marketing representative followed a general verbal script or a call flow of the main points the DDC representative was trained to cover in every such phone call. (Exh. 1, ¶ 4, Exh. 4, ¶ 6.) Hanigan testified that a "call flow with points that we wanted to cover in the call was put in writing….bullet points to help with the flow [of the calls]…..[T]he bullet points would help that representative cover certain things to get the end result that we wanted." (Exh. 2, pp. 48-49.)

16. The DDC representative first asked if the medical entity received inquiries about paternity testing and if the entity had a practice of providing referrals for paternity testing. (Exh. 1, ¶ 4, Exh. 4, ¶ 6). As Hanigan testified: "It starts with a phone call to that medical entity. We first inquire as to whether the medical entity is getting questions about paternity testing." (Exh. 2, p. 31).

17. If the entity said yes, it did receive inquiries about paternity testing, the representative would then ask permission to send that entity information about DDC's services so the entity could become educated about DDC and ultimately refer people to DDC for testing. Hanigan testified:

> The next step would be, if they say yes, they are getting calls, then we attempt to ask them to refer us, as I mentioned. In order for them to do that, we ask if there are materials that we can send them, materials that will further educate them and their confidence in DDC.

(Exh. 2, p. 33.)

18. The representative would then ask the medical entity if DDC could send it information about DDC's services in two (2) ways, by both fax and also by mail. Hanigan testified:

> If we've done our job on the phone, then we've done two things in order to get the information in people's hands....The two-step process for the person from DDC is to ask them if we can send them a fax to get something in their hands immediately and then follow up with information in the mail that could take a week or two to get to them but would be there for them to hand to people....So we would ask, 'Can I send you a fax? And can I follow up with brochures?'

(Exh. 2, pp. 33-35.)

Hanigan further testified:

> So we make the phone call. We personally connect, hopefully, with the other person on the other end of the phone. We ask if the get paternity testing [questions]. We ask them if they would refer us, and then we would put information in their hands for them to do that.

(*Id.* at 34.)

19.     If the medical entity provided DDC permission to fax it information about DDC's services, the representative would obtain and/or verify the entity's fax number, and then fax a flyer to the entity that contained DDC's contact information and information about DDC's services so the entity could keep it on hand for paternity testing referrals or just hang it up in its facility as a reference. (Exh. 1, ¶ 4, Exh. 4, ¶ 6.) Hanigan testified: "[M]y instruction to the team was to try to fax them because it gets in their hands right away. So verify the fax, and make notes of it. Either that means get the fax number or verify what we have in the database." (Exh. 2, p. 72.)

20.     The medical marketing team's practice and policy, since 1998, was to always call an entity and ask permission before sending an initial fax containing information about DDC's services. (Exh. 1, ¶ 5, Exh. 4, ¶ 7.)

Hanigan testified:

> Q:     And has that been the practice and policy to ask permission before sending an initial fax to a medical entity since 1998?
>
> A:     It was through my term until 2011.

(Exh. 2, p. 142.)

Mellott testified:

> Q:     And was this always the policy of the medical marketing team to ask permission before sending anyone a fax?
>
> A:     Yes, ma'am.

(Exh. 3, pp. 31-32.)

21.     Hanigan testified that this policy was in place because it would be a waste of DDC's time and energy to send faxes to entities that did not want them and therefore would not

refer DDC as a source of paternity testing:

> Q:    Why was that policy in place to always ask permission before sending an
>        initial fax to a medical entity?
>
> A:    Because it was a waste of energy and time to send a fax to somebody who
>        had not approved or agreed to receive it.

(Exh. 2, p. 142.)

Mellott testified that the policy of always asking permission before sending a fax was "just good

business practice." (Exh. 3, p. 32.)

22.    The medical marketing team's protocol and business practice was to work hard

and put in the time and effort to communicate one-on-one and make personal connections with

medical entities to establish and maintain its business relationships with them so that those

entities would refer DDC as a source for paternity testing. Hanigan testified:

> We found over time that our medical marketing team is really what separated us
> from our competitors. It was doing the hard work of making those on-to-one calls
> to try to strengthen – build and/or strengthen the relationships that we had with
> people in the medical field that were referring us. No one else was doing that kind
> of work.

(Exh. 2, p. 15.)

23.    DDC did not send marketing faxes to entities that had not provided prior express

permission to receive those faxes. Hanigan testified:

> Q:    Did DDC, based on your knowledge, ever send a fax to an entity that had
>        not previously given permission to receive a marketing fax from DDC?
> A:    No.

…

> Q:    The only time DDC has sent marketing faxes to medical entities is after
>        contact with that entity and after receiving permission to send that entity a
>        fax?
>
> A:    To my knowledge, yes.

(Exh. 2, pp. 142-143, 150)(objections omitted.)

Mellott testified:

> Q: To your knowledge, did DDC ever send someone a marketing fax without first having received permission from that entity to send them a fax?
>
> A: No, we never did.

(Exh. 3, p. 33.)

24. DDC did not purchase fax lists, nor did it indiscriminately send bulk marketing faxes. Hanigan testified:

> Q: To your knowledge, DDC has never purchased a list of fax numbers and just sent a mass fax broadcast to that list of fax numbers; is that correct?
>
> A: That's correct.

(Exh. 2, p. 149.)

25. It was the practice and policy of the medical marketing team, since 1998, to store on FileMaker contact information for all the entities the medical marketing team called and with whom DDC had a business relationship. (Exh. 1, ¶ 6, Exh. 4, ¶ 8).

26. It was also the practice and policy of the medical marketing team, since 1998, to keep track of all outbound and inbound calls to contacts in FileMaker and to also record contemporaneous notes of all conversations with contacts in FileMaker. (Exh. 1, ¶ 6, Exh. 4, ¶ 8).

27. If an entity asks DDC to stop sending it faxes, per the practices and policies of the medical marketing team, a note would be added to that entity's FileMaker record documenting the opt-out request and that entity's fax number would be deleted from its contact information in FileMaker immediately—or, at the latest, within 30 days—so that no future medical marketing faxes are sent to that entity. (Exh. 1, ¶ 10, Exh. 4, ¶ 9.) Hanigan testified:

> If someone received a fax and then either faxed us back, because our fax number's on the cover sheet, or called us and said 'We'd like to no longer receive

faxes,' we would note that in the Comment section. We would take the date, time, and the rep, and the Activity type would be Inbound, I believe. Then we would make comments to say, 'Person called/person faxed, asked to no longer receive faxes,' and then we would delete the fax number from that field in their record.'

…

Q:    Because, as we discussed earlier, the practice and policy of the medical marketing team, if someone that you had sent a marketing fax to somehow communicated to DDC that they no longer wanted to receive medical marketing faxes from DDC, the medical marketing team's practice and policy was to delete the fax number from the FileMaker record; is that correct?

A:    Yes.

Q:    And the practice and policy was also to make a note in the Comment section and also note the method by which the person requested to no longer receive faxes from DDC, correct?

A:    Yes.

(Exh. 2, pp. 131, 134.)

Mellott testified:

A:    If we were to receive an opt-out request from one of our contacts, our policy was to remove the fax number immediately and indicate in Comments that we received a request to have it removed. We could receive that request via phone. We could have received it by actually a return fax, sometimes even an email.

Q:    Okay.

A:    But it was, you know, standard policy that it was removed immediately and a comment was made.

(Exh. 3, p. 24.)

28.    DDC has had this same opt-out policy and procedure from 1998 to the present.

Hanigan testified:

Q:    And do you know, has this always been the policy of DDC since at least 1998 when you came in?

A:      Yes.

Q:      And is it currently the policy of DDC, if someone opts out, to immediately remove their fax information?

A:      Yes. Within 30 days.

Q:      Was it the policy in 2005?

A:      Yes.

Q:      Was it the policy in 2017?

A:      Yes.

Q:      And all of the time in between, correct?

A:      Yes.

(Exh. 2, p. 132.)

Mellott testified:

Q:      [W]as that opt-out policy still in effect the entire time that you were on the medical marketing team through 2013?

A:      Yes, ma'am.

(Exh. 3, p. 25.)

29.      Everyone on DDC's medical marketing team was trained to delete a medical entity's fax number from that entity's FileMaker record and to make a note of the opt-out request in FileMaker. Hanigan testified:

Q:      And everyone is trained on the medical marketing team to delete the fax number if someone makes an opt-out request and they are the person dealing with it and then also make a note of it in the Comment field, correct?

A:      Correct.

(Exh. 2, p. 132.)

Mellott testified:

> Q:      [W]ere you trained on what DDC's opt-out policy was when you first started on the team?
>
> A:      Yes, ma'am.
>
> Q:      And did you train other DDC marketing reps in your position as a supervisor about what the opt-out policy was?
>
> A:      Yes, ma'am.

(Exh. 3, p. 24.)

30.      DDC regularly updated its marketing materials, such as its faxes and brochures, to reflect changes or advances in DDC's services. (Exh. 3, pp. 103-104).

31.      DDC's medical marketing team made follow up phone calls to maintain their business relationships with medical entities and to ask the medical entities if they needed more information about DDC's services and/or to ask the medical entities if DDC could send them updated information about DDC's services. Hanigan testified:

> So if an entity has agreed to receive our information, we referred to that as an initial call. Then the follow-up call would be more about continuing that relationship through friendly communication and then asking about more information that we can send them.

(Exh. 2, p. 144.)

> We would update our pamphlets and brochures. Over time, for example, we would be able to lower our turnaround time for testing. So we might call and say, 'I know the last time we talked, I told you we could get results in two weeks. Well, that's down to one week now. That's reflected on our new brochures. Can I send you some of those?' We've added some tests as well over time.

(*Id.* at 104.)

### Plaintiff's Prior Express Permission to Receive the Faxes at Issue

32.      Plaintiff Advantage Healthcare, Ltd. ("Plaintiff" or "Advantage Healthcare") is a contact in DDC's FileMaker system. (Exh. 1, ¶ 7).

33.      DDC's FileMaker record for Advantage Healthcare ("FileMaker Record") shows

an initial phone call from DDC's medical marketing team to Advantage Healthcare on April 5, 2005 at 2:30 p.m. ("April 5th Call"). (*See* confidential documents bates-labeled DDC 000009-000014, 000021-000034, attached hereto as **Exhibit 5,** p. 2; *see also* Second Declaration of James Hanigan, attached hereto as **Exhibit 6**, ¶ 1; Exh. 1, ¶¶ 7-8.)

34.     The April 5th Call is the phone call that established the business relationship between Advantage Healthcare and DDC, and also the phone call during which Advantage Healthcare gave DDC prior express permission to send it faxes about DDC's services. (Exh. 1, ¶ 8.)

35.     The FileMaker Record shows that this initial phone call was made by a DDC representative with the initials "JRM" and was answered by "Barb" at Advantage Healthcare. (Exh. 5, p. 2; Exh. 1, ¶ 8).

36.     The contemporaneous notes taken by the DDC representative for the April 5th Call state: "Sure, hold on. Must have went to speak with someone. Said you can send info how does this work. verified fax and address...." (Exh. 5, p. 2.)

37.     The FileMaker Record for the April 5th Call shows that, consistent with the practice and policies of DDC's medical marketing team, a DDC medical marketing representative called Advantage Healthcare, asked permission to fax and mail information about DDC's services, verified Advantage Healthcare's fax number, and contemporaneously took notes about the conversation, including the fact that an individual named "Barb" at Advantage Healthcare gave DDC prior express permission to fax and mail Advantage Healthcare information about DDC's services. (Exh. 5, p. 2; Exh. 1, ¶ 8.) Hanigan testified:

> Q:     And you testified that where it says 'verified fax and address [in the comment field for the April 5th Call],' your understanding was that that meant that the sales rep, who, in this case was JRM, Jamie, had followed the ordinary, general protocol or call flow for an initial phone call with a

[medical entity] and had asked for permission to send a fax to Advantage Healthcare and had received permission to send a fax to Advantage Healthcare, verified the fax number, and then subsequently sent a fax to Advantage Healthcare, correct?

A:      Yes.

(Exh. 2, pp. 139-140.)

38.      Hanigan testified that, based on his extensive experience in and leadership of the medical marketing team, the comment for the April 5th Call in the FileMaker Record shows that the DDC representative asked Barb at Advantage Healthcare for prior express permission to send Advantage Healthcare a fax about DDC's services and that Barb gave the DDC representative prior express permission to fax Advantage Healthcare information about DDC's services:

Q:      'Verified fax and address [referring to comment for the April 5th Call in the FileMaker Record],' is that, based upon the normal call flow bullet points that DDC representatives would be expected to follow, the representative would indicate that he or she verified the fax and address after having obtained permission to send by fax and by mail?

A:      Correct. There would be no reason to say 'verified fax' unless we had gotten their permission to send them a fax.

(Exh. 2, pp. 71-72; *see also* Exh. 5, p. 2).

Q:      Based on your experience with the medical marketing team and the protocol that representatives were supposed to follow on initial calls to medical entities, if the Comment field says 'verified fax,' does that mean that the representative would have asked for permission to send a fax to that entity?

A:      Yes.

Q:      Is there any reason that you can think of, again, based on your knowledge and your experience in the medical marketing team, why someone would write 'verified fax' in a comment field if they were not going to send a fax to someone and if they had not asked permission to send a fax to someone?

A:      No.

(Exh. 2, pp. 141-142)(objections omitted.)

39.     Hanigan testified as follows regarding his interpretation of the comment section for the April 5th Call:

> So I'll give you my interpretation of how this note [for the April 5th Call] makes sense in my experience [with DDC's medical marketing team]. The person who answers the phone is not always the decision maker of an organization. So I would interpret this as, 'Sure, hold on. Must have went to speak to someone.' That's to go to someone and say, 'Can we take this information and can I refer these folks or do we have someone already?' So that person is going to check with somebody about what we asked, which is 'Can we send you information and can you refer DDC?' So the person came back and said, 'Said you can send info,' which is good news for us….Now the next part is where we follow up and then through, as I mentioned, our call flow to say, 'All right. My goal is to get them to refer DDC, and if they get calls, and if they will accept,' so she said, 'Sure, you can send,' then I want to send them a fax, and I want to mail them information, if I can. So JRM [DDC representative who made the April 5th Call and took contemporaneous notes about it] would say, 'Can I send you a fax?' And then we would go through the verification of 'Can you give me your fax number?' or 'Is this your fax number (630) 595-9097?' So we would verify what the fax was because we've had a conversation that we want to send them a fax.

(Exh. 2, pp. 69-70; *see also* Exh. 5, p. 2.)

40.     Hanigan's interpretation of the FileMaker Record for Advantage Healthcare, including his interpretation of the various comments and notes on that FileMaker Record, is based on extensive experience leading the medical marketing team from 1998-2011 and based on the training and instructions he gave members of the medical marketing team with regard to making outbound calls to medical entities, the general call flow to follow on those calls, and the manner in which to document interactions with medical entities in FileMaker. He testified:

> Q:      But your [interpretation of the FileMaker Record] is not the same reading as someone randomly walking off the street and reading it. Your interpretation is based on your extensive knowledge in the medical marketing team since 1998, and the fact that you trained the medical marketing representatives on how to take notes and the protocol that they should follow on initial phone calls and what they should write in FileMaker, correct? So that's a pretty logical and knowledgeable interpretation of what that comment field states based on your experience

14

in the medical marketing team at DDC, correct?

    A:     Yes.

(Exh. 2, pp. 140-141; *see also id.* at 72-73)(objections omitted.)

    41.    DDC's FileMaker Record for Advantage Healthcare contains a fax number. (Exh. 5, p.; *see also* Exh. 2, p. 133.) The fax number listed for Advantage Healthcare is 630-595-9097. (*Id.*)

    42.    DDC's FileMaker Record for Advantage Healthcare contains no notes indicating that Advantage Healthcare ever asked DDC to stop sending it faxes. (*See generally* Exh. 5.) Hanigan testified:

> Q:    Anywhere on this [FileMaker Record] where it says 'Snapshot of the activity tab,' do you see any comments showing that Advantage made any sort of inbound contact with DDC asking to opt out from any faxes?
>
> A:    No, I don't.

(Exh. 2, p. 146; *see also id.* at 147; Exh. 3, p. 26.)

    43.    Hanigan testified that an opt-out request meant that a contact never wanted to receive any faxes from DDC in the future:

> A follow-up call in an attempt to request if they wanted more information would then be subject to the caller's interpretation of that conversation. So if someone said, 'No, I don't need anything right now,' or, 'No, thank you,' or 'We're okay,' then we would interpret that to mean they've got flyers. They've got the information. They don't need any follow-up information now. So that would not be an opt-out. The only way it would qualify as an opt-out is if the person said, 'No, I don't want anything today, and I don't want you to send anything in the future.'

(Exh. 2, p. 158.)

    44.    Based on Hanigan's extensive experience in and leadership of the medical marketing team and his knowledge of the medical marketing team's opt-out policies and procedures, and based on the facts that Advantage Healthcare's fax number is still in DDC's

FileMaker Record and that there is no comment or note in the FileMaker Record indicating that Advantage Healthcare asked to opt out from receiving medical marketing faxes from DDC, Hanigan testified that Advantage Healthcare never asked DDC to stop sending it medical marketing faxes:

> Q:      So looking at this record and the fact that the fax number for Advantage Healthcare is still in there, and the fact that there is no comment that I can see that says 'Advantage Healthcare has asked to opt out of receiving faxes from DDC,' based on your experience and your knowledge of the practices and policies of the medical marketing team, can you say that Advantage has never asked to opt out from receiving faxes?
>
> A:      Yes.

(Exh. 2, pp. 133-134)(objections omitted.)

45.     Based on Mellott's experience in and leadership of the medical marketing team and her knowledge of the medical marketing team's opt-out policies and procedures, and based on the facts that Advantage Healthcare's fax number is still in DDC's FileMaker Record and that there is no comment or note in the FileMaker Record indicating that Advantage Healthcare asked to opt out from receiving medical marketing faxes from DDC, Mellott testified that Advantage Healthcare never asked DDC to stop sending it medical marketing faxes:

> Q:      If Advantage Healthcare had at any point asked DDC to stop sending it faxes, based on your experience and knowledge of DDC's marketing protocols, would there be, in the Comment field, something saying that Advantage had asked to stope receiving faxes?
>
> A:      That's correct.
>
> Q:      Do you see anywhere on here in the Comment field that Advantage Healthcare asked to stop receiving faxes from DDC?
>
> A:      No, ma'am.
>
> Q:      Looking at the top left of this [FileMaker record], where it says 'Fax Number,' do you see a fax number for Advantage Healthcare of (630) 595-9097?

A:      Yes.

Q:      And based on your experience and knowledge of the medical marketing team's opt-out procedures, if Advantage Healthcare had ever asked DDC to stop sending it faxes, would that fax number have been deleted?

A:      Yes, ma'am.

Q:      Okay. And the fact that the fax number is still on this FileMaker record, and there is no comment in the Activity tab saying Advantage Healthcare has asked DDC to stop sending it faxes, could you assume that, based on your experience in the medical marketing team, that Advantage Healthcare has not asked DDC to stope sending it marketing faxes?

A:      Yes.

(Exh. 3, pp. 26-27)(objections omitted.)

### **The Established Business Relationship Between Plaintiff and DDC**

46.     DDC's FileMaker Record for Advantage Healthcare shows another phone call made from DDC to Advantage Healthcare on April 11, 2007 at 1:46 p.m. ("April 7th Call"). (Exh. 5, p. 3; Exh. 1, ¶ 9.) The FileMaker Record shows that this phone call was made by a DDC representative with the initials "JXW" and that the conversation was with "Camielle" at Advantage Healthcare. (*Id.*)

47.     The contemporaneous notes taken by the DDC representative for the April 7th Call state: "Person okay'd. Said they have some of our info but would take updated ones. She wouldn't give me a name said the office mgr. opens all the mail. Needs Spanish." (Exh. 5, p. 3; Exh. 1, ¶ 9.)

48.     These notes indicate that the DDC representative mentioned that DDC had updated brochures about its services and that the DDC representative asked to whom the mail should be addressed. (Exh. 5, p. 3; Exh. 1, ¶ 9.) The notes also indicate that Advantage Healthcare already had information about DDC's services but agreed to accept updated

brochures, and also asked for information in Spanish about DDC's services. (*Id.*)

49.     DDC's medical marketing team representatives would occasionally, for purposes of testing the success of their outreach for paternity testing referrals, make "ghost calls" to DDC's contacts. (Exh. 6, ¶ 2; Exh. 5, p. 6; Exh. 2, p. 38.) During these "ghost calls," DDC medical marketing team representatives would, without identifying themselves as DDC medical marketing team representatives, ask contacts if they could refer a facility for paternity testing. (*Id.*)

50.     DDC's FileMaker Record for Advantage Healthcare shows that on April 2, 2013 at 1:52 p.m., a DDC medical marketing representative made a "'ghost call" ("Ghost Call") to Advantage Healthcare to ask if Advantage Healthcare could refer a facility for paternity testing. (Exh. 5, p. 6.)

51.     The contemporaneous notes for this Ghost Call show that a receptionist at Advantage Healthcare put the DDC medical marketing representative "on hold to find a flyer." (Exh. 5, p. 6; Exh. 6, ¶ 3.) The Advantage Healthcare receptionist named DDC as the referral for paternity testing and provided 1-800-362-2368 as the contact phone number: "came back with 3622368." (*Id.*)

52.     Hanigan testified, based on the comment for this Ghost Call to Advantage Health and his extensive experience in and leadership of the medical marketing team:

> Meaning we called and acted as if we were a person off the street needing a paternity test, and said, 'I need a paternity test. Do you do that?' Advantage would likely say, 'No.' 'Do you know where I can go?' And the person, as in the notes, put them on hold, found a flyer, came back with our phone number, so then we would be able to click the answer 'Yes' to "do they refer?"

(Exh. 2, p. 89; Exh. 5, p. 6.)

53.     Hanigan testified, based on his experience in and knowledge of the medical

marketing team practice and policies, that the "flyer" referred to in the comment for this Ghost

Call would have a been a marketing fax from DDC.

> Q:    When it says, 'Put me on hold to find a flyer,' what of DDC's marketing
>        materials would that be referring to, based on your knowledge?

> A:    A flyer would be the fax.

(Exh. 2, p. 148.)

54.    The phone number 1-800-362-2368 is the contact phone number found on fax

flyers sent by the DDC medical marketing team to medical entities to get referrals for DDC's

paternity testing services. (Exh. 6, ¶ 4; *see also* Dkt. ## 1-1, p. 2; 1-2, p. 2.)

55.    The FileMaker record for Advantage Healthcare shows multiple interactions and

communications between DDC and Advantage Healthcare over the course of many years. (*See

generally* Exh. 5.)

56.    The FileMaker Record for Advantage Healthcare shows phone calls from DDC to

Advantage Healthcare and contemporaneous call notes of conversations between DDC and

Advantage Healthcare on the following dates: April 5, 2005, April 11, 2007, and June 18, 2008.

(Exh. 5, p. 1.)

57.    The FileMaker Record for Advantage Healthcare shows that DDC sent three (3)

marketing faxes to Advantage Healthcare in 2013. (Exh. 5, p. 17.)

58.    The FileMaker Record for Advantage Healthcare shows that a DDC medical

marketing representative mailed the following items to Advantage Healthcare on April 11, 2007:

a) "Pamphlet Paternity"; b) "Paternity Teaser REGULAR"; c) "Paternity Teaser PRENATAL";

D) "Paternity Teaser SPANISH". (Exh. 5, pp. 3, 5.)

### The Faxes at Issue

59.    The contact phone number (1-800-362-2368) that DDC includes on fax flyers sent

by the DDC medical marketing team to medical entities to get referrals for DDC's paternity testing services appears on the faxes attached as Exhibits A and B to the Complaint. (*See* Dkt. ## 1-1, p. 2; 1-2, p. 2; *see also supra* ¶ 54.)

60.     Exhibit A to the Complaint includes the following opt-out notice: "If you no longer wish to receive faxes from DDC, please email your fax number to contact@dnacenter.com or call 1-877-241-6512. We will honor opt-out requests within 30 days." (Dkt. #1-1, p. 2.) The opt-out notice on Exhibit A is located on the bottom of the first page of the fax. (*Id.*)

61.     Exhibit B to the Complaint includes the following opt-out notice: "If you no longer wish to receive faxes from DDC, please email your fax number to: info@dnacenter.com, call 1-877-241-6512, or fax 1-800-825-3084. We will honor opt-out requests within 30 days." (Dkt. #1-2, p. 2.) The opt-out notice on Exhibit B is set off in its own separate text box. (*Id.*)

62.     The headers for Exhibits A and B show that both faxes were sent to (630) 595-9079, which is the fax number that appears for Advantage Healthcare in DDC's FileMaker Record. (*See* Dkt. ## 1-1, p. 2; 1-2, p. 2; *see also supra* ¶ 41.)

63.     DDC faxed Exhibits A and B to Advantage Healthcare because Advantage Healthcare had previously provided DDC with prior express permission to send it faxes about DDC's services and because Advantage Health never opted out of receiving marketing faxes from DDC. Hanigan testified:

Q:      Why did you send these two faxes [Exhibits A and B] to Advantage?

…

A:      My advice [for revamping medical marketing for DDC] was to pull the records that already consented to faxes and send them a fax again.

(Exh. 2, p. 111.)

Q:    [W]hen faxes were sent from DDC to Advantage in in January and May of 2017 [Exhibits A and B to the Complaint], the criteria that you used to send them to Advantage was that Advantage had previously given permission to receive a fax to DDC and had not subsequently asked DDC to stop sending faxes, correct?

A:    Correct.

(*Id.* at 145-146)(objections omitted.)

WHEREFORE, Defendant DNA DIAGNOSTICS CENTER, INC. respectfully requests that this Court enter an Order granting summary judgment in its favor on Plaintiff's individual claims on the basis that The Faxes were sent with Plaintiff's prior express permission. In the alternative, if this Court does not find that The Faxes were sent with Plaintiff's prior express permission, Defendant requests that this Court enter an Order granting summary judgment in its favor on Plaintiff's individual claims on the basis that The Faxes were sent pursuant to a valid established business relationship between Defendant and Plaintiff and contain compliant opt-out notices.

Respectfully Submitted,

By:    /s/ Yesha Hoeppner
        Attorney for Defendant

Eric L. Samore
Yesha Hoeppner
SMITHAMUNDSEN LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3200

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 26th day of October 2018, she caused the foregoing **Defendant DNA Diagnostics Center, Inc.'s Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in support of its Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56** to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record at their email addresses on file with the Court.

[x]     Pursuant to 28 USC Section 1746(2), I certify under penalty of perjury that the foregoing is true and correct. Executed on: October 26, 2018.

/s/ Yesha Hoeppner

Eric L. Samore
Yesha Hoeppner
SMITHAMUNDSEN LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3200